# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NALCO COMPANY, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 11-760 (RMC) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION ON MOTION FOR PRELIMINARY INJUNCTION

Nalco Company sells OxiPRO,™ a system to aid in killing microbial growth in the manufacturing process of pulp and paper mills. After lengthy consideration and analysis, the Environmental Protection Agency concluded that the addition of ammonia or urea products to the sodium hypochlorite in the system resulted in a new and different pesticide from the chlorine solution itself. Thus, in December 2010 EPA determined that the ammonia and urea products sold within the OxiPRO system must be registered as "pesticides" under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136-136y. Despite this conclusion, the EPA enforcement order that arose from this decision only prohibited Nalco from selling its ammonia- and urea-based products to new customers; it permitted on-going sales to existing customers. In March 2011, Nalco's competitors sued EPA, demanding that EPA stop Nalco's sales of ammonia and urea products altogether.[1] Then, on April 18, 2011, EPA changed course and issued a Stop Sale Order, requiring Nalco to cease all sales of urea-based products and limit sales of its ammonia-based product. The competitors dropped their suit against EPA. Nalco seeks a preliminary injunction

---

[1] *See Ashland Inc. v. EPA*, 11-cv-487 (BAH), Compl. [Dkt. #1].

against enforcement of the April Stop Sale Order, asserting that the Order is arbitrary and capricious.

EPA argues that the Court has no jurisdiction to rule on its enforcement choices and, alternatively, that it has changed its enforcement posture from December 2010 to April 2011 for legitimate reasons. These arguments would have more force if EPA had not indicated at oral argument that it changed its position in part to level the commercial market between Nalco and its competitors. There is no basis in FIFRA for EPA to exercise its enforcement authority to balance markets; such a purpose constitutes arbitrary and capricious action. Additionally, EPA distinguished, without explanation, Nalco's urea-based products and its ammonia-based product. Because Nalco has met the standards required to obtain a preliminary injunction, the Court will enjoin enforcement of the April 18, 2011 Stop Sale Order and remand the matter to EPA for reconsideration.

## I. FACTS

Nalco seeks to enjoin the April 18, 2011 Stop Sale Order issued by EPA.[2] The Stop Sale Order arises from a December 16, 2010 Letter Determination by EPA that some of Nalco's products must be registered under FIFRA. The Stop Sale Order requires Nalco to cease selling its urea-based products 60615 and 60630 altogether and prohibits the sale of its ammonia-based product 60620 to all but current 60620 customers.[3] Nalco seeks to enjoin enforcement of the April Stop Sale Order until EPA has completed its review of Nalco's registration of the products for use under FIFRA.

---

[2] Defendants include both EPA and its Administrator, Lisa P. Jackson, in her official capacity. Defendants are collectively referred to as "EPA."

[3] Nalco's 60615 product is 15% urea, its 60630 product is 30% urea, and its 60620 product is 20% ammonia.

Nalco is a process and water treatment solutions provider to customers in the energy, paper, and water industries.[4] The "wet-end" processing in a pulp and paper mill produces slime-causing microorganisms that corrode and damage paper-making equipment and degrade paper quality. Amelioration of these problems requires specialized application and monitoring of products designed to control slime. For the past five years, Nalco has sold an integrated water treatment system called OxiPRO, which consists of (1) chemical products; (2) online monitoring tools; and (3) on-site technical service by Nalco personnel.

The first chemical product in the OxiPRO system is a sodium hypochlorite "biocide" that kills microorganisms; it is registered under FIFRA and approved for this use by EPA. When added to water, sodium hypochlorite forms hypochlorous acid, an extremely reactive compound. The OxiPRO system introduces a second type of chemical product to reduce the reactivity of the acid; Nalco says that these products are proprietary "stabilizers" that are either ammonia- or urea-based. Neither party disputes that the "ammonia- and urea-based stabilizers used in the OxiPRO system do not have any biocidal activity themselves (that is, they do not kill microbes), nor are they registered as pesticides with EPA under FIFRA." Am. Compl. ¶ 21.

In developing the OxiPRO system, Nalco relied on an informal email exchange, dated September 8, 2005, in which EPA allegedly "confirmed that ammonia-based chlorine stabilizers do not require registration under FIFRA when used together with sodium hypochlorite." *Id.* ¶ 23. EPA advised that "[a]mmonia used in that manner is non-pesticidal." EPA Mem. in Support of Opp'n to Pl.'s Mot. for Prelim. Inj. ("EPA Mem.") [Dkt. # 5], Ex. 5 (Emails). Because Nalco's ammonia-

---

[4] The facts are taken from the Amended Complaint unless otherwise indicated. *See* Am. Compl. [Dkt. # 22].

and urea-based stabilizers function in nearly identical ways, Nalco did not specifically inquire as to the status of urea-based stabilizers. Am. Compl. ¶ 23.

However, in 2007, after Nalco's competitor Buckman Laboratories, Inc., registered a similar ammonia-based product as a pesticide, Nalco petitioned EPA to reconsider Buckman's registration.[5] EPA treated this request as a petition to cancel the registration of the Buckman product. EPA Mem. at 10. In September of 2008, Buckman cross-petitioned, urging EPA to prohibit further distribution and sale of Nalco's unregistered ammonia-based product immediately. In 2009, additional competitors, Ashland Inc. and its subsidiary Hercules Incorporated (collectively "Ashland"), also filed a petition asking EPA to prohibit Nalco from selling its ammonia- and urea-based products.[6]

Thus, starting in 2007, EPA became caught in the middle of an ongoing fight for market share among Nalco, Buckman, and Ashland. EPA commenced a multi-year process to resolve whether ammonia- and urea-based products used in conjunction with sodium hypochlorite were pesticides that required registration under FIFRA. EPA did not interrupt Nalco's sales of ammonia- and urea-based products in the meantime. EPA convened multiple meetings to consider ammonia- and urea-based stabilizers and reviewed reams of submissions by Nalco, Buckman, and Ashland. In February 2010, EPA held an "Ammonia/Urea Meeting," "to discuss the competing petitions filed by the companies challenging the need for registration of ammonia and urea as

---

[5] During the fall of 2007 when Nalco became aware of Buckman's registration of an ammonia-based product, Nalco also exchanged additional emails with EPA. On September 19, 2007, EPA opined that when ammonia is used with a hypochlorite, the ammonia would in fact constitute a pesticide. EPA Mem. [Dkt. # 5], Ex. 5 (Emails).

[6] Ashland distributes a registered ammonia-based product that is manufactured by Ameribrom, Inc. *See* EPA Mem., Ex. 8 (Dec. 16, 2010 Letter) at 1.

pesticides (Nalco), and petitioning EPA to stop Nalco from marketing [its] ammonia and urea products (Ashland and Buckman)." *See* EPA Mem., Ex. 1 (Harrigan-Farrelly Decl.) at ¶ 18. EPA also opened a docket for public comment on whether or not ammonia and urea products for use in the pulp and paper industry should be required to be registered as pesticides. *See id*. at ¶ 19.

Only after a comprehensive review did EPA announce its conclusions in a December 16, 2010 Letter Determination:

> The Agency has determined, based on the activity and fundamental purpose of adding ammonia and/or urea to chlorinated water to facilitate the production of chloramine for biocidal purposes, that Nalcon 60615 [Nalco's 15% urea-based product] and Nalcon 60620 [Nalco's ammonia-based product] are required to be registered under FIFRA . . . .
>
> EPA has carefully reviewed the available information concerning how ammonia and urea function as part of biocidal control systems in the pulp and paperboard industry . . . . Neither ammonia nor urea, by itself, has pesticidal activity. Nonetheless, . . . EPA has determined that the three companies directly state or imply and intend that their products should be added to chlorinated water as part of a biocide control system in the pulp and paperboard industry where the material will interact with chlorine that is also added to the water. *Once the ammonia or urea is added, it reacts with chlorine to ultimately form a new chemical substance, chloramine.* (Urea in the presence of sodium hypochlorite or a chlorine source forms a chlorourea, which undergoes further chemical reaction to form chloramine.) As the three companies know, the chloramine formed following the addition of ammonia and urea to chlorinated water has pesticidal activity against microbial organisms. Moreover, compared to chlorine, chloramine exhibits extended antimicrobial activity.
>
> . . . [T]his occurs as a result of the chemical reaction between the chlorine and either the ammonia or urea and not as a result of physical action. . . .
>
> . . . Based on the fact that ammonia and urea are consumed in an irreversible chemical reaction and that a new chemical is formed, which possesses pesticidal activity[,] neither ammonia nor urea can

be classified as stabilizers.

EPA Mem., Ex. 8 (Dec. 16, 2010 Letter) at 2-4 (emphasis added). EPA concluded that Nalco must submit "full application packages" for its ammonia- and urea-based products within 30 days. *Id.* at 5. Nalco did so, and EPA committed to expedited handling of the application "by early summer." *See* EPA Mem., Ex. 1 (Harrigan-Farrelly Decl.) ¶ 38.[7]

On December 16, 2010, the same day that EPA issued its Letter Determination, EPA also issued a Memorandum Response to Comments, which provided EPA's responses to comments submitted as part of the public proceeding. In response to a question regarding potential "environmental and human effects" posed by ammonia and urea as used by Nalco products, EPA stated:

> Based on its review of the applications to register the Ameribrom Inc. product for which Ashland is the distributor and the Buckman products, and based on the information provided about the ways in which the Nalco product is intended to be used, *EPA does not think that these uses of ammonia or urea are posing risks of concern*.

EPA Mem., Ex. 10 (Response to Comments) at 6 (emphasis added).

On December 29, 2010, EPA issued its first enforcement order based on the December 16, 2010 Letter Determination. While the December 29 Order prohibited Nalco from selling its ammonia- and urea-based products to new customers, it also expressly permitted Nalco to continue to provide all of its existing customers with ammonia- and/or urea-based products, pending registration of the products as pesticides. Pl.'s Mot. for Prelim. Inj. [Dkt. # 3], Ex. 2 (Dec. 29, 2010 Order) at 4.

Ashland sued EPA, challenging its December 29 Order and seeking to enjoin EPA

---

[7] At oral argument, EPA counsel defined this as "sometime in July." Tr. May 6, 2011 at 37.

from permitting Nalco to continue to sell its ammonia- and urea-based products to existing customers pending EPA registration. Months after issuing the December 2010 Order and days before issuing the April Stop Sale Order at issue here, EPA defended its December Order. EPA argued to the district court that it had made "eminently reasonable and lawful EPA enforcement choices" that were reflected in the December Order. *Ashland Inc. v. EPA*, 11-cv-487 (BAH), Defs.' Mem. in Suppt. of Mot. to Dismiss and Opp'n to Mot. for Prelim. Inj. [Dkt. #17] at 9 (filed Apr. 6, 2011). EPA further pointed out that Nalco had been selling ammonia- and urea-based products since 2007 and 2008, *id.* at 16, and asserted that EPA's December 2010 decision to allow Nalco to continue selling its ammonia and urea products "reflected a methodical, responsible, and meaningful enforcement approach that [was] neither arbitrary nor capricious." *Id.* at 20.

Shortly thereafter, EPA sent a new draft order to Nalco by which all sales of the urea-based products would be prohibited and only limited sales of the ammonia-based product would be allowed to existing ammonia-product purchasers. The December 2010 Order had permitted Nalco to sell ammonia- and urea-based products to all of its current customers. Thus, under the terms of the December Order, Nalco arguably could substitute sales of its ammonia-based product for its urea-based products to its OxiPRO customers.[8] The April draft order clearly did not permit this; it permitted sales of the ammonia-based products only to existing ammonia-based product customers. EPA refused to modify this provision — that is, EPA refused to allow the sale of Nalco's ammonia-based product to those Nalco OxiPRO customers who had been relying on the urea-based products.

On April 18, 2011, EPA finalized the draft and issued the Stop Sale Order that is challenged here. *See* EPA Mem., Ex. 3 (Apr. 18, 2011 Stop Sale Order). It required Nalco to

---

[8] EPA disputes this interpretation of the December Order. *See* Tr. May 6, 2011 at 27 & 31.

"immediately" stop selling and servicing its urea products to existing customers; it gave Nalco 48 hours to notify its customers; and it restricted sales of the ammonia-based product to existing ammonia-based product customers. *Id*. ¶¶ 34–37. Because the April Stop Sale Order superseded the December Order, Ashland stipulated to the voluntary dismissal of its federal court action against EPA. *See id.*, Stipulation of Dismissal [Dkt. # 26].

Nalco then filed this suit against EPA. Nalco seeks a preliminary injunction against enforcement of the April Stop Sale Order, asserting that the Order is arbitrary and capricious.[9]

## II. JURISDICTION

When reviewing a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged. *Barr v. Clinton*, 370 F. 3d 1196, 1199 (D.C. Cir. 2004). To determine whether it has jurisdiction over the claim, a court may consider materials outside the pleadings. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005). No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is both a statutory and an Article III requirement. *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003). The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).

While EPA contests the Court's jurisdiction to review its December 16, 2010, Letter

---

[9] Nalco originally sought a temporary restraining order but, after oral argument on that motion, EPA voluntarily agreed to a stand-still of the April Stop Sale order and a return to the terms of the December 2010 Order. After full briefing on Nalco's motion for preliminary injunction and a second oral argument, EPA agreed to maintain the status quo under the December 2010 Order until the Court could consider and decide Nalco's motion for a preliminary injunction.

Determination, it concedes jurisdiction over the April 18, 2011 Order. *See* EPA Mem. at 27. For purposes of its motion for a preliminary injunction, Nalco challenges only the April Stop Sale Order.[10] Even so, EPA argues that the Court's review must be limited to a determination of whether EPA had enforcement authority to issue the Stop Sale Order and that the Court may not review the manner in which EPA exercised this authority. EPA claims that it acted based on unreviewable prosecutorial discretion.

In making this argument, EPA relies on *Heckler v. Chaney*, 470 U.S. 821 (1985), and *Association of Irritated Residents v. EPA*, 494 F.3d 1027, 1030 (D.C. Cir. 2007). Under *Heckler v. Chaney*, an agency's decision not to prosecute or enforce is generally committed to the agency's discretion and where the governing statute is written "in such broad terms that . . . there is no law to apply," the decision not to enforce is not reviewable. 470 U.S. at 830; *see also Ass'n of Irritated Residents*, 494 F.3d 1031-32 (applying *Heckler* to an agency decision to settle an enforcement action). That is, where an agency has decided not to take enforcement action and there are "no judicially manageable standards" available for judging how and when an agency should exercise its discretion, the decision not to enforce is not reviewable. *Id*.

*Heckler* and *Association of Irritated Residents* do not apply to affirmative enforcement action such as that at issue here. In cases where an agency decides to take enforcement action, "that action itself provides a focus for judicial review." *Robbins v. Reagan*, 780 F.2d 37, 47 (D.C. Cir. 1985). "[W]e begin with a presumption of reviewability, which is only rebutted by an

---

[10] EPA interpreted the initial Complaint as challenging only the December 19, 2010, Letter Determination. However, Nalco made it clear that its request for preliminary injunction related only to the April 2011 Stop Sale Order. *See* Reply [Dkt. # 7] at 9. Moreover, Nalco filed an Amended Complaint clearly challenging the April Stop Sale Order. *See* Am. Compl. ¶¶ 49-54.

affirmative showing that the statute's allocation of discretion is so broad that the courts simply have no standards to apply." *Id*. "Courts have a clear role to play in ensuring that an agency's practical implementation of its program is consistent with its own declared intentions and goals. Courts often have invalidated agency action because it simply did not comport with standards of rational decision-making given the agency's uncontested goal." *Id*. at 46. Furthermore, "an agency's change in direction from a previously announced intention is a danger signal that triggers scrutiny to ensure that the agency's change of course is not based on impermissible or irrelevant factors." *Id*. at 48.

The April Stop Sale Order is such a "change in direction from a previously announced intention." *See id*. In 2005, EPA indicated in an email that Nalco's ammonia-based product did *not* act as a pesticide. *See* EPA Mem. [Dkt. # 5], Ex. 5 (Emails). EPA then reversed this view in a September 2007 email. *Id*. In its December 2010 Letter Determination, EPA took official action, finding that Nalco was required to file for pesticide registration of its ammonia- and urea-based products. The ensuing December 2010 Order permitted Nalco to continue sales to its current customers. Pl.'s Mot. for Prelim. Inj. [Dkt. # 3], Ex. 2 (Dec. 29, 2010 Order) at 4. Then, in the April 2011 Stop Sale Order, EPA did another about face. It restricted sales of the ammonia-based product to existing ammonia-based customers only, and it required that Nalco stop sales of its urea-based products. *See* EPA Mem., Ex. 3 (Apr. 18, 2011 Stop Sale Order) ¶¶ 34-37. This change in course triggers the Court's scrutiny of whether EPA's decision was based on impermissible or irrelevant factors, whether it was in fact arbitrary and capricious. *See Robbins*, 780 F.2d at 48. In sum, the Court has jurisdiction to review the April 2011 Stop Sale Order.

# III. ANALYSIS

## A. Standard for a Preliminary Injunction

A district court may grant a preliminary injunction "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. Of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). An injunction is an equitable remedy so its issuance is one which falls within the sound discretion of the district court. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). A plaintiff seeking a preliminary injunction must establish that:

> (a) he is likely to succeed on the merits;
>
> (b) that he is likely to suffer irreparable harm in the absence of preliminary relief;
>
> (c) that the balance of equities tips in his favor; and
>
> (d) that an injunction is in the public interest.

*Winter v. NRDC, Inc.*, 555 U.S. 7, 129 U.S. 365, 374 (2008). The D.C. Circuit has further instructed that "the movant has the burden to show that all four factors . . . weigh in favor of the injunction." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

In the past, courts have balanced the four factors on a "sliding scale," *i.e.*, a lesser showing on one factor could be surmounted by a greater showing on another factor. *CSX Transp., Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005). *Winter v. NRDC* called this approach into question: "[i]ssuing a preliminary injunction based only on a *possibility* of irreparable harm [despite finding a strong likelihood of success on the merits] is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 129 U.S. at 375-76. The D.C. Circuit has interpreted *Winter* to

require a positive showing on all four preliminary injunction factors. *Davis*, 571 F.3d at 1292.

## B. Likelihood of Success on the Merits

Nalco bases its request for a preliminary injunction on its claim that EPA acted arbitrarily and capriciously in violation of the Administrative Procedure Act "(APA"), 5 U.S.C. §§ 701–706. *See* Am. Compl., Count II ¶¶ 49-54. The APA provides a cause of action to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Review under the APA is limited to "final agency action" for which there is no other adequate remedy in a court. *Id*. § 704. A agency action is final when it "(1) marks the consummation of the agency's decision making process — it must not be of a merely tentative or interlocutory nature; and (2) the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Domestic Secs., Inc. v. SEC*, 333 F.3d. 239, 246 (D.C. Cir. 2003) (internal quotation marks omitted); *accord Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see also CSI Aviation Servs., Inc. v. Dept. of Transp.*, 637 F.3d 408 (D.C. Cir. 2011) (final order issued in enforcement action was a final agency action subject to judicial review). The parties agree that the April Stop Sale Order was a final agency action.

The APA requires a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001). In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted). At a minimum, the agency must have considered relevant data and articulated an

explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986). An agency action usually is arbitrary or capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs.*, 463 U.S. at 43. Rather, the agency action under review is "entitled to a presumption of regularity" and the court must consider only whether the agency decision was based on relevant factors and whether there has been a clear error of judgment. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

In cases involving scientific or technical decisions within the agency's area of expertise, the agency is entitled to a "high level of deference." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998). Judges are not "scientists independently capable of assessing the validity of the agency's determination." *Id.* at 1327. Instead of making an independent assessment, courts must hold the agency to the standards of rationality required by the APA. *Id*.

Here, EPA presents a tidy syllogism to counter Nalco's request for a preliminary injunction:

- Nalco sells and distributes unregistered pesticides to pulp and paper mills for use as part of a biocidal system to control microbial growth in pulp and paper production equipment.

-13-

- FIFRA makes it unlawful for any person to sell or distribute unregistered pesticides.

- Therefore, Nalco's request for the extraordinary remedy of a preliminary injunction to enable it to distribute and sell unregistered and ammonia- and urea-based pesticides in violation of FIFRA should be denied.

*See* EPA Mem. at 1. The syllogism would suffice were there not such a disconnect between EPA's decisions in December 2010 and in April 2011. In December 2010, after three years of study and consideration, EPA indicated that it did "not think that these uses of ammonia or urea are posing risks of concern." *See* EPA Mem., Ex. 10 (Response to Comments) at 6. For this reason, EPA permitted Nalco to continue sales to existing customers as spelled out in the December Order. On April 6, 2011 EPA defended the December Order as a "methodical, responsible, and meaningful enforcement approach that [was] neither arbitrary nor capricious." *See Ashland Inc. v. EPA*, 11-cv-487 (BAH), Defs.' Mem. in Suppt. of Mot. to Dismiss and Opp'n to Mot. for Prelim. Inj. [Dkt. #17] at 20. Despite the determination that there was little risk to using the ammonia and urea products and despite the determination that both products initiate a chemical reaction that results in chloramine,[11] the April Stop Sale Order treats the products differently — requiring sales of urea-based products to cease and permitting sales of the ammonia-based product to existing customers.

EPA offered the "several considerations" which led it to issue the April 2011 Stop Sale Order:

First, EPA recognized that its initial December 29, 2010, stop sale order had not addressed one of Nalco's two urea products, Nalco 60630, which EPA learned of only after Nalco filed a registration

---

[11] *See* EPA Mem., Ex. 8 (Dec. 16, 2010 Letter) at 3 ("Once the ammonia or urea is added, it reacts with chlorine to ultimately form a new chemical substance, chloramine.").

-14-

>application. Second, EPA recognized that whereas it had previously approved product registrations for products similar to Nalco's ammonia-product [sic], EPA had *never* previously approved any product registration for any comparable urea-products [sic]. As a result, EPA concluded that it lacked sufficient assurance that the continued distribution, sale or use of Nalco's urea products will not pose unreasonable adverse effects. Third, EPA concluded that it should modify the December Stop Sale Order so as to limit the allowable dosage rate of Nalco's ammonia-product [sic] to the rate Nalco proposed as part of its registration application.

EPA Mem. at 14. The validity of these points is hotly contested. The Court need not dwell on the science involved — EPA is the Agency charged with scientific analysis — except to note the lack of reasoning behind the unspoken conclusion that urea-originated chloramine is more dangerous, questionable, or unknown than ammonia-originated chloramine. Given the similarity of the chemical substance created by the addition of ammonia and urea to sodium hypochlorite — on which EPA has based its entire finding that OxiPRO produces pesticides which must be registered — EPA's silence on this point is greatly troubling.

Even more troubling, however, is EPA's response when questioned by the Court for an explanation of its *volte-face* on enforcement other than the *Ashland* suit against EPA (a non-FIFRA-recognized basis for enforcement). EPA told the Court that it wanted to level the marketplace for competitors Ashland, Hercules, and Buckman, against whom Nalco had had a head start with an effective product, now requiring registration, in the pulp and paper industry. EPA indicated that it did not want to reward an ill-gotten market share by permitting Nalco to sell its ammonia product to anyone who was not a current buyer of such product.

>[EPA is] mindful that to the extent that Nalco has gained market share by selling this unlawful urea product, EPA doesn't feel it's appropriate to reward the creation of that market share by allowing Nalco to substitute another unregistered product for the urea product. So here you have a company that made no effort to obtain a

> registration for its urea product. It gained inroads in the market by doing so. They have created a market for themselves by doing so. Why is it exactly necessary for EPA to entitle them to keep that market share that was illegally created?[12] EPA didn't think that was a just result.

Tr. May 6, 2011 at 26.

FIFRA does not give EPA jurisdiction to control or modify the marketplace. The Court is left with an unexplained basis for EPA's apparent distinction between urea-originated chloramine and ammonia-originated chloramine and a totally *ultra vires* desire on the Agency's part to play a role in leveling the commercial marketplace among competitors. Neither explanation saves the April 2011 Stop Sale Order, and the Court concludes that it is arbitrary, capricious, and insufficiently supported by reasons within the realm of EPA's authority and expertise. Accordingly, the Court finds that there is a strong likelihood that Nalco will succeed on the merits of its APA challenge to the April Stop Sale Order.

### C. Irreparable Harm

EPA contests any real harm to Nalco because it has alternative products to counteract slime in pulp and paper mills and its other business products generate substantial revenues. Nalco begs to differ. Nalco presents evidence that the cost and disruption to its customers' mills would be substantial and that, once forced to change its anti-slime system from OxiPRO, a customer would be unlikely to incur voluntarily such cost and disruption a second time to return to Nalco's product. *See* Pl.'s Mot. for Prelim. Inj., Ex. 4 (Ancona Decl.). EPA counters with an affidavit from Nalco's

---

[12] Nalco also disputes the characterization of its market share as "illegally created." The issue of whether the ammonia- and urea-based products were required to be registered under FIFRA was presented to EPA via the Nalco and Buckman petitions in 2007. EPA did not require Nalco to register its ammonia- and urea-based products until 2010. Nalco developed its market share before EPA required product registration. *See* Tr. May 6, 2011 at 46.

-16-

competitor Ashland, stating that Ashland has been able to replace OxiPRO at a former Nalco client without any such problems. *See* EPA Mem., Ex. 11 (Chaney Decl.) As Nalco points out, Ashland's affidavit is silent as to whether its replacement work was performed during a normal planned shutdown of a mill or a government-required abrupt stoppage. At oral argument, EPA was unable to provide further information, except to note that one major customer, International Paper, has already jumped from Nalco to Ashland due to this enforcement action. *See* Tr. May 6, 2011 at 38.

Nalco's evidence supports the conclusion that it has already, and will inevitably further, suffer the loss of "[l]ong-standing clients . . . [that may be] unwilling, or unable, to do business" with Nalco hereafter if no injunction is issued. *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50-51 (D.D.C. 2008). Since the relevant marketplace is not in a growth industry, Nalco has also demonstrated that "it will be difficult for [it] to attract new customers." *Id.* This shows at least some degree of irreparable injury. *Id.* Further, EPA's actions threaten a loss of sales and goodwill for which Nalco will have no right of recourse against the federal government. Where a plaintiff "cannot recover damages from the defendant due to the defendant's sovereign immunity . . . any loss of income suffered by plaintiff is irreparable *per se*." *Id*. at 51; *see also Hoffman-Larouche, Inc. v. Califano*, 453 F. Supp. 900, 903 (D.D.C. 1978) (economic loss for which there is no corrective relief available is irreparable); *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (finding the loss of goodwill and "loss of profits which could never be recaptured" constituted irreparable harm sufficient for equitable relief). The Court concludes that Nalco has sufficiently demonstrated irreparable harm to warrant equitable relief.

### D. Balance of Equities

On the one hand, we have EPA's two responses to OxiPRO after years of study: its

"methodical, responsible and meaningful" decision in December 2010 to ban sales of OxiPRO to new customers but allow continued sales to those customers whose mills are already using the products; and EPA's later insistence that sales of the urea-based products cease immediately and that sales of the ammonia-based product be restricted to only existing customers of that product. On the other hand, we have Nalco's likelihood of success and showing of irreparable harm. Certainly, enforcement of FIFRA is within the reasonable discretion of EPA and Nalco is selling unregistered products that EPA has found constitute pesticides. That fact weighs in EPA's favor. EPA's faulty reasoning for its enforcement choice, however, weighs against it. The balance of equities tips in Nalco's favor.

### E. Public Interest

The public interest lies in enforcement of FIFRA and safety from dangerous pesticides to which it is directed. Public interest also lies in appropriate and reasoned enforcement of federal statutes. The public interest is not served to the extent EPA acted on the erroneous belief that it had the power and authority to level the marketplace among competitors. The public interest also is not served when the record fails to demonstrate some reasoned basis for an agency's enforcement position.

Agencies enforce federal laws with the exercise of their discretion. EPA certainly can exercise its discretion in how it chooses to enforce FIFRA according to the risks and harms any circumstance may present. As presented here, EPA explains its new enforcement posture as based on its unfamiliarity with urea-based products. That explanation does not carry much weight since the urea-based products and the ammonia-based product — which Nalco is allowed to continue to sell — produce the same chemical (chloramine) and EPA concluded that the risk was negligible after

years of study. The Court finds that the public interest is best served by enjoining enforcement of the April 2011 Stop Sale Order, leaving the December 2010 Order in place, and remanding the matter to EPA to re-think its approach and, if it chooses, to provide a sufficient rationale for its actions.

## IV. CONCLUSION

The Court respects EPA's obligation to enforce FIFRA as it determines in its discretion. On this record, however, that discretion has been exercised for reasons not in furtherance of the statute and without a reasoned basis. Nalco's motion for preliminary injunction [Dkt. # 3] will be granted. An injunction will issue to preclude enforcement of the April 2011 Stop Sale Order, the December 2010 Order will remain in effect, and the matter will be remanded to EPA to allow it to re-think its approach and, if it chooses, to provide a sufficient rationale for its actions. A memorializing Order accompanies this Memorandum Opinion.


Date:  May 18, 2011               /s/
                                  ROSEMARY M. COLLYER
                                  United States District Judge